IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRENDA MVENG-WHITTED,

        Plaintiff,

v.                                     Civil Action No. 3:11-cv-00842-JAG

THOMAS LAROSE,
Individually and in his official capacity as
Chairperson of the Art Department of
Virginia State University, *et al*.

        Defendants.

## MEMORANDUM OPINION

This matter comes before the court on the defendants' motion for summary judgment. (Dkt. no. 40.) Brenda Mveng-Whitted, a tenured professor at Virginia State University ("VSU"), accuses VSU of racial discrimination and retaliation under Title VII of the Civil Rights Act. She also contends that her supervisor in the art and design department, Dr. Thomas Larose, discriminated against her on the basis of race in violation of 42 U.S.C. § 1981.

Despite the many wrongdoings she alleges against VSU and Larose, Mveng-Whitted remains a tenured professor at the University. Her salary has increased during her time at VSU, her benefits remain unchanged, and she is scheduled to teach a full course load at the University this fall. No reasonable juror could conclude that Mveng-Whitted suffered an adverse employment action, or that the defendants had discriminatory motives for any actions respecting the plaintiff. Accordingly, the Court GRANTS the defendants' motion for summary judgment.

## I.   **FACTS**

In August 1998, Mveng-Whitted, an African-American who holds master's degrees in graphic design and African art history, began working as an instructor at VSU. VSU promoted her to assistant professor in 2002 and to associate professor in 2004. In 2003, she also became coordinator of the art and design unit, following the art department's merger with the music department. In 2004 Mveng-Whitted became tenured, a status she holds to this day. (Mveng-Whitted Dep. 39-40.)

Until 2006, the professional relationship between Mveng-Whitted and Larose proceeded without incident. Mveng-Whitted even supported Larose's application for tenure in 2006, calling him "an accomplished art historian," "one of the finest educators to join the faculty," "an innovative thinker" who seeks "to optimize the educational experience of each student," "well organized," and a "master teacher." (Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem."), Mveng-Whitted Dep. Ex. 18.) Mveng-Whitted also agreed that "working with [Larose] has been a meaningful experience," and that Larose was an "asset" to VSU. (*Id.*)

### A. *The Professional Relationship Deteriorates*

In June 2006, Larose became chairperson of the music, art, and design department, a position he held from July 1, 2006, until June 30, 2010. From July 1, 2010, to June 30, 2011, he served as coordinator of the art and design program. In both capacities, Larose supervised all faculty in the art and design department, including the scheduling and staffing of classes.

After Mveng-Whitted recommended Larose for tenure, the professors' relationship turned sour. Larose and Mveng-Whitted disagreed over course assignments, the number of students in classes, and computers. Mveng-Whitted alleges that Larose did not support her work-related projects as much as those of other faculty members, and accused her of lacking skills and

2

qualifications necessary to teach certain classes.  Larose, in turn, questioned Mveng-Whitted's skills and credentials, including her ability to teach certain courses.  (Larose Dep. 14:11-16:24; 21:12-22:23.)

### 1.  Computers

With respect to computers, in 2006, Mveng-Whitted requested that VSU provide desktop and laptop computers containing updated software.  According to Mveng-Whitted, only she and another African-American design professor had computers with outdated software that did not help with instruction.  (Pl.'s Opp'n, Ex. N, June 29, 2006 letter from Mveng-Whitted to Larose.) Larose had cited VSU's computer use policy in denying Mveng-Whitted's request to take the updated computers home, even for work-related purposes.  (*Id.*, June 12, 2006 e-mail from Larose to Mveng-Whitted.)  Later, in the fall of 2008, Larose gave a "computer classroom equipped with up-to-date software to a new [Caucasian] instructor" with less experience than Mveng-Whitted.  (Mveng-Whitted Aff. ¶ 18.)  Mveng-Whitted did receive new computers for her classroom, but they lacked updated software.  (*Id.*)

### 2.  Class Assignments

Scheduling constitutes one of the main points of contention between Larose and Mveng-Whitted.  VSU has almost complete discretion in making teaching assignments.  Mveng-Whitted's contract states:

> "Your duties and responsibilities will be defined for you by the Chairperson of your Department and approved by the Dean of your School and the Provost. These will involve the load of scheduled teaching for the academic year, supplementary activities related to the educational program of the University, and include a reasonable share of committee work, regular attendance at the meetings of the departmental faculty, school faculty, general faculty-staff meetings, and required participation in designated academic ceremonies..."

In the spring of 2008, the National Association of Schools of Art and Design ("NASAD") reviewed VSU's art and design department and recommended increased variation among

3

teaching assignments. (Mveng-Whitted Dep. 59:10-21.)    Mveng-Whitted knew about this recommendation. (*Id.*)[1]  Accordingly, in the fall of 2009, Larose determined that all faculty should teach at least one foundation class, although Mveng-Whitted claims she was not aware of Larose's decision. (*Id.* 59:22-60:1.)  Foundation courses are those required of all students pursuing a particular major, such as "Art 101." (*Id.* 59:3-9.)  Larose assigned Mveng-Whitted to teach certain foundation courses in studio art, instead of those in Mveng-Whitted's disciplines of graphic design and African art. (Pl.'s Statement of Material Disputed Facts ¶¶ 10-15.)  He also assigned Mveng-Whitted's design courses to Caucasian instructors. (Mveng-Whitted Aff. ¶ 17.)

Larose required Caucasian instructors to teach foundation courses, too. (Mveng-Whitted Dep. 60:6-19.)  Even Larose taught a foundation course during his time as department chair. (*Id.* 60:20-24.)  Mveng-Whitted acknowledges that she taught foundation courses both before and after Larose's chairmanship. (*Id.* 63:3-5.)  She contends, however, that the foundational course assignments harmed her career because they made her appear incompetent, as the courses were beyond her areas of expertise and she did not have enough time to prepare to teach them. At his superiors' direction, Larose permitted Mveng-Whitted to teach design courses.

Due to a health issue, Mveng-Whitted requested to teach courses with smaller class sizes. (Hill Dep. 13-14.)  In response to the request, VSU's Human Resources department limited

---

[1] In her summary judgment papers, Mveng-Whitted reverses course and denies knowledge of the NASAD's recommendation. (Pl.'s Statement of Material Disputed Facts ¶ 7.)  The Court credits Mveng-Whitted's deposition testimony rather than her subsequent, contradictory statements submitted in opposition to the defendants' motion for summary judgment. "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990) (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984); *see also Holloway v. City of Suffolk*, 660 F. Supp. 2d 693, 696 (E.D. Va. 2009) ("The plaintiffs, however, may not create an issue of fact by submitting an affidavit that is inconsistent with their prior deposition testimony.").

Mveng-Whitted's class sizes to 8-10 students. (Dkt. no. 52-1 at 2.) Unsatisfied, Mveng-Whitted complained that Larose was "disrespecting [her] disability accommodations" by "overload[ing] [her] classes with students." (Pl.'s Opp'n, Ex. N, Aug. 26, 2008 e-mail from Mveng-Whitted to Larose.) Taking an about-face, four months later Mveng-Whitted requested permission to teach a class with twelve enrolled students that was being taught by an adjunct, as opposed to the current class Mveng-Whitted was teaching that only had one student enrolled. (Id., Jan. 13, 2009 email from Mveng-Whitted.)[2] Mveng-Whitted complained that she, as a tenured professor, should have priority over an adjunct concerning teaching preference.

On December 13, 2010, Mveng-Whitted asked to move her operations from the art and design suite to a different building. (Mveng-Whitted Dep., Ex. 4.) She requested the move because of the "hostile environment that [she] believed she was working under." (Pl.'s Statement of Disputed Material Facts ¶ 24.) Mveng-Whitted did not, however, request cessation of her teaching assignments in her disciplines of African art and graphic design. (Mveng-Whitted Aff. ¶ 35.)

After her relocation, Mveng-Whitted catalogued VSU's art collection and taught (with VSU's permission) an African art course at Fort Lee which paid her an additional $2,100 plus mileage reimbursement of $0.50/mile.[3] Mveng-Whitted says that, despite her wishes to the contrary, VSU relieved her of all teaching assignments in the music, art and design department effective June, 2011. (Compl. ¶ 41; Mveng-Whitted Aff. ¶¶ 35-36.) Actually, she simply

---

[2] Mveng-Whitted claimed in a September 20, 2009 e-mail to Dr. Hill that she could "teach at least 40 students." (Pl.'s Opp'n, Ex. N, Sept. 29, 2009 e-mail from Mveng-Whitted to Hill.)

[3] Although Mveng-Whitted admittedly enjoyed working with the art collection, she believes this assignment to have been beneath the duties of a tenured art professor. (Mveng-Whitted Dep. 27:5-8; Pl.'s Statement of Disputed Material Facts ¶ 27.)

changed departments, moving in the fall of 2011 to the mass communications department. In her new department, Mveng-Whitted has taught classes, worked on graphic design projects, and assisted in developing art curricula, which she has enjoyed. (Mveng-Whitted Dep. 15:10-17:7; 21:1-13; Mveng-Whitted Aff. ¶ 41.)

In 2012, Mveng-Whitted taught one class each semester, far less than the normal course load of three courses per semester to which she was accustomed. Before leaving the art and design department, Mveng-Whitted taught three courses each semester. (Mveng-Whitted Aff. ¶ 42.) Larose also took Mveng-Whitted off committees within the art and design department. (Mveng-Whitted Aff. ¶ 47.) According to Mveng-Whitted, Larose replaced her on one committee with an unqualified Caucasian instructor, even though Mveng-Whitted's contract requires her to serve on departmental committees. (*Id.* ¶ 53.) When she confronted Larose about her class assignments, he stated that another instructor was more qualified to teach design courses and that Mveng-Whitted was not qualified to serve on committees or teach African art and illustration.

Mveng-Whitted also contends that Larose celebrates the accomplishments of students in white professors' classes, but not the achievements of students of black professors. (Mveng-Whitted Aff. ¶ 48.)

### 3. Student and Professor Complaints About Larose

As might be expected in an internecine squabble, students and faculty members have chosen sides in the conflicts between Mveng-Whitted and Larose. The plaintiff has filed a number of affidavits from these observers, but they provide nothing to help the Court decide this case. One former student overheard Larose speak "very negatively" about Mveng-Whitted with other professors. (Pl.'s Opp'n, Ex. D at ¶ 3.) Two former students report overhearing other

6

students say that Dr. Larose had asked them to "write a derogatory letter about Mveng-Whitted's teaching performance." (*Id.* ¶ 7; *see also id.*, Ex. F at ¶ 3.)  According to one former student, "Dr. Larose cleared the art and design department of anyone with dark skin." (*Id.*, Ex. D at ¶ 8.) He and another former student noted that, during class, Larose read from a text where "the 'n' word was used and [Larose] spoke the word out." (*Id.* ¶ 12; *see also id.*, Ex. G at ¶ 4.)  A friend of Mveng-Whitted's alleges overhearing Dr. Hill once say, "We all know he's [Dr. Larose] a racist." (*Id.*, Ex. H at ¶ 5.)

The former chair of the VSU faculty senate claims that Larose had "autonomously established himself as the Chair of Art and Design, even including [] on official University documents." (*Id.*, Ex. E at ¶ 9.)  According to the plaintiff, Larose is not, in fact, chair of the art department. (*Id.* ¶¶ 8-9.)

## B. *Performance Evaluations*

Prior to Larose's tenure, Mveng-Whitted received positive performance evaluations each year of her employment.  In 2007, however, during Larose's first full year as chair of the music, art and design department, Mveng-Whitted received a poor performance evaluation, even though Larose had never observed her in the classroom.  She only became aware of this negative evaluation in June 2010.  Since 2007, she has not received any further evaluations from Larose.

## C. *Reduction of African-American Professors*

Mveng-Whitted alleges that, as department chair, Larose began a systematic plan to reduce the number of African-American instructors in the Art and Design Department.  When Larose became chair of the department, it had three full-time African-American instructors, and five African-American adjuncts. (Mveng-Whitted Aff. ¶ 39.)  Currently, there are no African-American full-time professors in the department, and there are four African-American adjunct

7

professors. (*Id.* ¶ 40; Hill Dep. 19-21.)  As evidence of discrimination plan, Mveng-Whitted cites the firing of two African-American adjunct instructors, Philip Branch and a "Mr. Williams,"[4] as well as the resignation of Frances Young, an African-American assistant professor.  Mveng-Whitted does not know why Larose terminated Branch and Williams; she cannot say whether race factored into the terminations. (Mveng-Whitted Dep. 52:5-19.)[5]

Young, who taught graphic design, resigned from VSU on August 1, 2007.  Mveng-Whitted claims that Larose forced Young out by assigning her to teach classes outside of her expertise, and then gave her classes to a Caucasian adjunct instructor. (Mveng-Whitted Aff. ¶ 7.) In her resignation letter to Larose, Young never suggests that her resignation resulted from discrimination.  (Pl.'s Opp'n, Ex. B.)  She also never mentions being asked to teach classes outside her area of expertise.  Larose replaced Young with a Caucasian female. (Mveng-Whitted Aff. ¶ 9.)

VSU's Vice-President, Dr. Hill, completely disagrees with any assertion that Larose favored white professors over African-American professors. (Hill Dep. 19:9-17.)  During his chairmanship, Larose hired at least two African-American adjunct professors.  (Mveng-Whitted Dep. 50:15-51:18.)   Mveng-Whitted cannot explain why Larose would hire African-American professors if he harbored some sort of discriminatory animus towards African-Americans.

---

[4] During her deposition, Mveng-Whitted could not recall the first name of her colleague, "Mr. Williams." (Mveng-Whitted Dep. 50:3-6.)

[5] Branch was an artist who taught courses like "life drawing" and "watercolor painting."  At the time of his termination, Branch occupied a full-time position as Director of the Arts in Healthcare Program at Virginia Commonwealth University Medical Center.  (Branch Aff. ¶ 2.) Larose terminated Branch because he occupied a "full-time day job at VCU" and Larose knew of others in need of employment more than Branch.  (*Id.* ¶¶ 6, 8.)  Branch believes this to have been an "anomalous reason for termination," and surmises it was racially motivated.

(Mveng-Whitted Dep. 52:20-25.)   Mveng-Whitted also does not address the two Caucasian members of the department who also resigned during Larose's tenure as chair.

### D.  Application for Promotion to Full Professor

In the fall of 2009, Mveng-Whitted applied for a promotion to full professor.  Promotion applications at VSU proceed through a multi-step process.  *First*, the Promotion and Tenure Committee for the department of music, art and design reviewed Mveng-Whitted's application and did not recommend her for promotion to full professor.  (Mveng-Whitted Dep. at Ex. 8.)  Larose did not sit on this Committee.   To be recommended, an applicant must rank as "outstanding" in teaching, and "outstanding" in either scholarly research/creative activities or professional service.  Mveng-Whitted did not satisfy any of these criteria.

*Second*, Larose reviewed Mveng-Whitted's application and did not recommend her for promotion.  Larose ranked Mveng-Whitted "unsatisfactory" in all three assessment categories.  (Dkt. no. 47-21.)   In his remarks, Larose noted that Mveng-Whitted was "not an effective teacher," had been "repeatedly late to class," and often left students unattended in the classroom.  (*Id.*)   Larose also complained that Mveng-Whitted's scholarly research was "sub-standard," including a lack of any "publications, books or articles."  (*Id.*)   He also noted that Mveng-Whitted was not a member of any national or regional graphic design or art groups, and was generally "a non-collegial person."  (*Id.*)

*Third*, the Dean of VSU's School of Liberal Arts and Education, Dr. Andrew Kanu, an African-American, reviewed Mveng-Whitted's tenure application.   "Based on the recommendation of the chair [i.e., Larose] *and* the [Promotion and Tenure Committee for the department of music, art and design]," Dr. Kanu "[did] not support [Mveng-Whitted's] application for promotion to the rank of Full Professor." (Dkt. no. 47-20 (emphasis added).)

*Fourth*, the University Promotion and Tenure Committee reviewed and rejected Mveng-Whitted's promotion application, noting her "failure to satisfy the . . . Requirements for Advancement in Rank for Collegiate/Instructional Faculty" in the VSU Handbook, as well as her "unsatisfactory scholarly research/creative activities for the rank of professor." (Mveng-Whitted Dep., Ex. 9.) Dr. Ephrem Eyob, chair of the UPTC, authored the rejection letter on behalf of the Committee. Dr. Eyob is black.

*Fifth*, Dr. Hill, Vice-President for Academic Affairs, conducted his own independent review and denied Mveng-Whitted's tenure application. In his denial letter, Dr. Hill "found no documentation for a consistent record of scholarly productivity." (Mveng-Whitted Dep., Ex. 10.) Dr. Hill is African-American.

*Finally*, Mveng-Whitted appealed the denial of her promotion application to the five-member Appeals Subcommittee of the Faculty Senate Reconciliation Committee (the "Appeals Committee"). Neither Hill nor Larose served on the Appeals Committee. The Appeals Committee reviewed all materials pertaining to Mveng-Whitted's application, conducted a hearing in Mveng-Whitted's presence, and "voted to reject [Mveng-Whitted's] appeal and recommend[ed] that she not be granted promotion to Professor at this time." (Mveng-Whitted Dep., Ex. 11.) In doing so, the Appeals Committee succinctly noted that there was "no consensus that an Outstanding rating in teaching and an Outstanding rating in either scholarly research/creative activities or professional service has been demonstrated." (*Id.*)

### E. The Terminal Contract Letter

On May 3, 2010, Dr. Hill sent Mveng-Whitted a letter explaining that VSU "recently lost significant state funding, and the University has been informed that funding will be substantially reduced again in fiscal year 2011-2012." (Mveng-Whitted Dep., Ex. 17.) Due to these budget

constraints, Hill informed Mveng-Whitted that she would receive a "nine-month terminal contract [for the 2010-2011 academic year] at the end of which [she would] no longer be employed at VSU." (Id.) As it turns out, Mveng-Whitted's termination never came to pass. On June 16, 2010, Hill informed Mveng-Whitted that the retirement of a colleague in the art and design department meant that Mveng-Whitted's "position [would] not be eliminated." (Dkt. 41-2.) Mveng-Whitted received a revised continuing contract at her current rank, with tenure. (*Id.*)

Mveng-Whitted remains a tenured faculty member at VSU, with no break in employment and no reduction in salary or benefits. Indeed, Mveng-Whitted received tenured appointments as associate professor in the department of music, art and design for the academic years 2011-2012, and 2012-2013. (Mveng-Whitted Dep., Exs. 2 and 3.) Her salary increased by nearly $3,000 during this period, and she continued to perform teaching responsibilities at the University.

## II.   PROCEDURAL HISTORY

On February 19, 2011, Mveng-Whitted and Lawrence Hawthorne, a former African-American professor at VSU, brought an eight-count complaint as joint plaintiffs against VSU and Larose. The complaint alleged assorted claims under 42 U.S.C. §§1981 and 1983, and Title VII of the Civil Rights Act. On August 24, 2012, the Court dismissed four claims against VSU on the basis of sovereign immunity (Counts 1, 5, 6 and 8). The Court denied the defendants' motion to dismiss the Title VII claims against VSU (Counts 3 and 4). The Court also concluded that the plaintiffs' discrimination claims against Larose (Counts 2 and 7) stated plausible claims for relief and, therefore, survived dismissal. Finally, because the plaintiffs' factual allegations were sufficiently distinct to constitute two separate civil actions, the action was severed into two separate actions. On August 9, 2013, the Court granted summary judgment against Hawthorne on his remaining § 1981 claim against Larose.

11

VSU and Larose now seek summary judgment on Mveng-Whitted's Title VII claims against VSU (Counts 3 and 4) and her Section 1981 claim against Larose (Count 2).[6]

## III.    STANDARD OF REVIEW

Summary judgment is appropriate where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Importantly, to defeat summary judgment, Mveng-Whitted (as the non-moving party) may not rest upon conclusory allegations, the "mere existence of a scintilla of evidence," or the appearance of some "metaphysical doubt" concerning a material fact but, instead, must set forth specific facts showing a genuine issue for trial. *Id.* at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Thus, Mveng-Whitted, as the party with the burden of proof on the issues before the Court, cannot prevail at summary judgment on those issues unless she adduces evidence that would be sufficient, if believed, to carry the burden of proof on those issues at trial. *See Celotex*, 477 U.S. at 322.

At the time the defendants sought summary judgment, Mveng-Whitted was proceeding *pro se*.[7]  While the Court will liberally construe Mveng-Whitted's *pro se* pleadings, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), "the 'special judicial solicitude' with which a district court should view . . . *pro se* [filings] does not transform the court into an advocate." *Weller v. Dep't of Social Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

---

[6] Mveng-Whitted originally alleged racial discrimination under 42 U.S.C. §§ 1981 and 1983, but has elected to proceed only under § 1981. (Dkt. no. 26.)

[7] She now has counsel.  Her attorneys have not sought leave to supplement her briefs.

## IV.    DISCUSSION

### A.   Title VII Discrimination and Retaliation Claims against VSU

Title VII forbids an employer from discriminating against an employee with respect to conditions of employment on account of that employee's race. *See* 42 U.S.C § 2000e-2(a)(1). The anti-retaliation provision prohibits an employer from "discriminate[ing] against any of [its] employees . . . because [s]he has made a charge . . . or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* § 2000e-3(a). Title VII's statute of limitations restricts actionable violations to those that occurred within the 300 days preceding the plaintiff's EEOC filing. 42 U.S.C. § 2000e-5(e)(1). The statute severely limits the actionable conduct for which Mveng-Whitted may seek relief. Mveng-Whitted "initiated EEOC proceedings against VSU on September 24, 2010." *Mveng-Whitted-Whitted v. Va. State Univ.*, 2012 U.S. Dist. LEXIS 120763, at *14 (E.D. Va. Aug. 24, 2012). To support her Title VII claims, therefore, Mveng-Whitted may rely on the defendants' conduct that occurred between November 28, 2009, and September 24, 2010. Despite the abundance of alleged wrongdoing set forth both in the complaint and in the parties' summary judgment papers, Mveng-Whitted's Title VII claims boil down to three discrete actions occurring within the applicable limitations period: (1) rejecting Mveng-Whitted's application for promotion to full professor; (2) issuing Mveng-Whitted a terminal contract on May 3, 2010, and (3) assigning her foundational courses.[8]

---

[8] The complaint alleges that VSU rejected Mveng-Whitted's application for full professor on November 19, 2009. As the summary judgment record makes clear, however, Mveng-Whitted appealed this decision, and a VSU Appeals Committee issued its final decision denying Mveng-Whitted's application on June 18, 2010. Hence, the denial of Mveng-Whitted's application for full professor is properly considered with respect to Mveng-Whitted's Title VII claims.

13

1.    *Application for Full Professor*

a.    *Discrimination.*

In order to establish a *prima facie* claim of a discriminatory failure to promote under Title VII, a plaintiff must show that she: (1) is a member of a protected class; (2) applied for promotion and tenure; (3) was qualified for the position of full professor with tenure; and (4) "was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination." *Alvarado v. Bd. of Trs. of Montgomery Cmty. College*, 928 F.2d 118, 121 (4th Cir. 1991); *see also Weathers v. Univ. of N.C. at Chapel Hill*, 447 F. App'x 508, 510 (4th Cir. Sept. 29, 2011). No reasonable juror could conclude that race played a role in the denial of Mveng-Whitted's application for full professor.

Mveng-Whitted's application underwent a multi-tiered review process, and VSU gave Mveng-Whitted the opportunity to present her case for promotion. To be recommended, an applicant must rank as "outstanding" in teaching, and "outstanding" in either scholarly research/creative activities or professional service. Nearly fifteen (15) tenured professors reviewed Mveng-Whitted's application, none of whom ranked Mveng-Whitted "outstanding" in any category. Notably, the Promotion and Tenure Committee for the department of music, art, and design – which Larose did not sit on – reviewed Mveng-Whitted's application, and recommended against promoting her. (Mveng-Whitted Dep. at Ex. 8.) this independent review *preceded* Larose's negative review of Mveng-Whitted's promotion application, but those faculty members sitting on the Committee reached the same conclusion regarding Mveng-Whitted's qualifications for promotion. Mveng-Whitted does not assert that those individuals (the majority of whom were African-American) acted under or with any racial animus against her. (*Id.*)

14

Although Larose later gave Mveng-Whitted an extremely poor review when recommending that Mveng-Whitted's application be denied, subsequent reviewers all independently analyzed Mveng-Whitted's submissions and found them equally insufficient based on objective criteria, *e.g.*, failure to satisfy the promotion criteria and a lack of scholarly research/creative activities. These professors confirm in sworn testimony that Larose *never* influenced their decisions to vote against Mveng-Whitted's application. (Kanu Aff. ¶ 5; Eyob Aff. ¶ 6.) Moreover, many of the individuals sitting on the tenure review committees were African-American, a fact which does not help Mveng-Whitted's discrimination claim. *See Taylor v. CNA Corp.*, 782 F. Supp. 2d 182, 198 (E.D. Va. 2010) ("an allegation of discrimination loses persuasiveness when a key player in the disciplinary process falls within the same protected class as the plaintiff."). No factual basis exists to support Mveng-Whitted's bald assertion that Larose's "incredibly damaging recommendation" "infected" the tenure review process.

The bulk of Mveng-Whitted's objection to the review process focuses on her subjective belief that she was qualified, at the time of her application, for promotion to full professor. (Pl.'s Opp'n 7-10.) This argument is unavailing. "[Mveng-Whitted's] perception of [her]self . . . is not relevant. It is the perception of the decision maker which is relevant." *Smith v. Flax*, 618 F.3d 1062, 1067 (4th Cir. 1980); *see also Smith v. Am. Nat'l Red Cross*, 1992 U.S. App. LEXIS 32049, at *10-11 (4th Cir. Dec. 4, 1992) ("It is the employer's prerogative, . . . not the applicant's, to establish what criteria are relevant to the hiring decisions. . . .").[9] Moreover,

---

[9] Many reviewers noted that Mveng-Whitted lacked accomplishment in the area of scholarly research (at least as it pertains to scholarly publications, books, or articles). Mveng-Whitted does not challenge these findings in her summary judgment papers. "Publish or perish" is often the watchword of academia, and courts in this District have held a lack of publication during a professor's term of employment at a school to be a legitimate, non-discriminatory reason for denial of tenure. *See Rosado v. Va. Commonwealth Univ.*, 927 F. Supp. 917, 937 (E.D. Va. 1996)

"[t]enure is one of the most difficult of all academic decisions," is "not to be accorded to all professors" and "involves a degree of subjectivity." *Smith v. Univ. of North Carolina*, 632 F.2d 316, 345 (4th Cir. 1980). Hence, "[u]nsure how to evaluate the requirements for appointment, reappointment and tenure, and reluctant to interfere with the subjective and scholarly judgments which are involved, the courts have refused to impose their judgment as to whether the aggrieved academician should have been awarded the desired appointment or promotion." *Id.* at 345-46. Rather, the issue is only whether VSU denied her a promotion for a discriminatory reason. *Id.* And where discrimination is lacking, the tenure decision is not required to be "rational, wise, or [even] well-considered." *Id.* at 346.

There is not even a hint of racial animus in the denial of Mveng-Whitted's application for full professor. This Court will not question the independent judgment of multiple professors who reviewed Mveng-Whitted's application and concluded, based on multiple objective criteria, that it should not be approved. *See Jiminez v. Mary Washington College*, 57 F.3d 369, 376 (4th Cir.

---

(finding that the defendant employer articulated a legitimate, non-discriminatory reason where "[t]he comments of the members of the promotion and tenure committees reflect a reasoned decision not to promote or grant tenure based on lack of a constant and Satisfactory record of research and publication.").

Moreover, Larose's review also concluded that Mveng-Whitted was often late to class, did not remain in the classroom during the class period, and left students unattended. Mveng-Whitted also does not challenge these findings. The bottom line is that Mveng-Whitted was given every available opportunity to present her case for promotion to VSU, and multiple levels of independent review concluded that Mveng-Whitted was unqualified. Because Mveng-Whitted was unqualified for a promotion, she cannot establish a *prima facie* case of discrimination.

1995) (noting in the academic setting, "we review professorial employment decisions with great trepidation.").[10]

*b.    Retaliation*

To establish a *prima facie* retaliation claim under Title VII, a plaintiff must show: (1) "engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citation omitted).

Mveng-Whitted engaged in protected activity when she claimed race discrimination in complaints made to the Virginia Human Rights Council and Virginia Department of Human Resource Management in August of 2010, and the EEOC in late September of 2010. (*See* Pl.'s Opp'n 32; *see also id.*, Ex. T.) The Court will assume, without deciding, that Mveng-Whitted suffered an adverse employment action because the denial of a promotion might dissuade a reasonable associate professor from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 68 (2006). Mveng-Whitted's retaliation claim still fails, however, because she cannot establish that the promotion denial had anything to do with her protected activity.

The Supreme Court recently held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action[,]" and not merely a "motivating factor." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528, 2534 (2013). Here, no reasonable juror could conclude that Mveng-Whitted's promotion application was denied *because* of her complaints of discrimination. Indeed, many of the faculty

---

[10] Similar to the university professor in *Weathers*, Mveng-Whitted also "failed to identify a faculty member outside her protected class who had attained promotion and tenure with an academic record similar to hers." 447 F. App'x at 510. This constitutes yet another reason why Mveng-Whitted's "Failure to Promote" claim fails as a matter of law.

members reviewing Mveng-Whitted's application (other than Larose) were unaware that Mveng-Whitted had previously alleged discrimination and/or retaliation against VSU or Larose. (*See* Dkt. nos. 52-3 at ¶ 7, 52-4 at ¶ 6, 52-5 at ¶ 7.) Mveng-Whitted has not demonstrated a causal link between her protected activity and the denial of her promotion application because she fails to make the threshold showing that everyone reviewing her application knew that she had engaged in protected activity. "[B]y definition," a plaintiff alleging retaliation "must show . . . that the defendant was aware of her engaging in protected activity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). A plaintiff carries the ultimate burden of establishing that the decision-makers taking adverse action against the plaintiff knew of the plaintiff's protected activity. Mveng-Whitted has not met her burden. Yet, even assuming Mveng-Whitted could establish each faculty member's knowledge, Mveng-Whitted has failed to adduce sufficient facts to permit the inference that the denial of her application would not have occurred "but for" her complaints of discrimination.

### 2. The Terminal Contract

a.    *Discrimination.*

The same result obtains with respect to the University's decision to issue Mveng-Whitted a terminal contract in May of 2010. In this written decision, VSU's interim Vice-President for Academic Affairs – an African-American – explained to Mveng-Whitted that "drastic" reductions in state funding required the University to adjust its budget. Those adjustments involved the very difficult decision to eliminate certain salaried professors, including Mveng-Whitted, from VSU's employ. According to Mveng-Whitted, Larose recommended to Hill that Mveng-Whitted be selected for termination. Mveng-Whitted's discrimination claim pertaining to the terminal contract fails for two reasons: (1) she has not suffered an adverse employment

18

action; and (2) there is no evidence that the reasons given for the terminal contract were a pretext for discrimination.

Despite the issuance of the terminal contract, Mveng-Whitted never lost her job. After another professor in the art and design department retired, Mveng-Whitted's contract was no longer terminal. Mveng-Whitted received a revised continuing contract at her current rank, with tenure. Mveng-Whitted has suffered no break in employment and no reduction in salary or benefits. She continues to hold a tenured appointment as an associate professor. (Mveng-Whitted Dep., Exs. 2 and 3.) Her salary has *increased.* The University Registrar affirms that Mveng-Whitted will teach three courses in the fall of 2013, a course load similar to those she has handled in the past. (Bonner Aff. ¶ 5 (dkt. no. 52-7).) Such circumstances do not an adverse action make.

"Regardless of the route a plaintiff follows in proving a Title VII [or Section 1981] action, . . . the existence of some adverse employment action is required. This court has set forth clearly what constitutes an adverse employment action. An adverse employment action is a discriminatory act which 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal citations and footnotes omitted) (quoting *Von Gunten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)). "An evaluation merely causing a loss of prestige or status is not actionable." *Id.* Also, "an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action." *Id.* at 377.

Mveng-Whitted argues that she suffered an adverse action because she no longer teaches courses in the art and design department. "The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *Holland v.*

*Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007).  "Absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* (citations omitted).  Mveng-Whitted's "dislike of [her] new position, alone, does not transform the transfer into an adverse employment action." *Cole v. Hill Phoenix, Inc.*, 2013 U.S. Dist. LEXIS 16877, at *12 (E.D. Va. Feb. 7, 2013); *see also Huber v. Texas Woman's Univ.*, 504 F. Supp. 2d 198, 203 (S.D. Tex. 2007) (male professor at female university did not suffer adverse employment action when he was assigned to teach platform courses because such a decision "is not an ultimate employment decision protected by Title VII's anti-discrimination provisions."). Because Mveng-Whitted did not suffer an adverse employment action, her Title VII race discrimination claim must fail.

Even assuming Mveng-Whitted could establish a *prima facie* case of discrimination, her Title VII claim still fails as a matter of law because she cannot demonstrate pretext.  On its face, the basis for VSU's termination decision (budget constraints) was legitimate and non-discriminatory, and this Court is not in a position to second-guess it.  *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) (in employment discrimination actions, it is not the role of the Court to "sit as a super-personnel department, weighing the prudence of employment decisions.").

Once the defendant comes forward with a legitimate reason for an adverse action, the plaintiff must come back and show that the legitimate reason offered by the defendant was not the real reason for the adverse employment act, but instead merely a pretext for intentional discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Mveng-

Whitted must prove *both* that VSU's reason was false *and* that discrimination was the real reason for the adverse employment action. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08 (1993). This Mveng-Whitted cannot do.

No evidence in the record contradicts VSU's assertion that it suffered a significant decrease in state funding, or that state dollars would be "substantially reduced again in fiscal year 2011-2012." (Defs.' Mem., Mveng-Whitted Dep. Ex. 17.) In fact, VSU's subsequent conduct unequivocally establishes that race played no role in the decision to issue Mveng-Whitted a terminal contract. A little more than a month after issuing the terminal contract letter, VSU informed Mveng-Whitted that the retirement of a fellow colleague in the art and design department, who also happened to be African-American, meant that Mveng-Whitted's "position [would] not be eliminated." (Dkt. 41-2.) Quite obviously, the unexpected retirement of a fellow professor in the same department provided the additional funding necessary for the University to keep Mveng-Whitted employed as a professor. Accordingly, Mveng-Whitted received a revised continuing contract at her current rank, with tenure. No reasonable factfinder could conclude, based on this evidence, that Mveng-Whitted initially received a terminal contract because of her race. Instead, all of the evidence establishes that the terminal contract was issued for budgetary purposes, and then promptly rescinded once the funds necessary to support Mveng-Whitted's professorship became available.

b.    *Retaliation.*

Mveng-Whitted also cannot establish that VSU issued her terminal contract as retaliation for a previously asserted discrimination complaint against the University. Mveng-Whitted raised

21

most of her complaints[11] after VSU issued the terminal contract. Those later-filed complaints necessarily could not have formed the basis for VSU's terminal contract decision. Mveng-Whitted made earlier complaints against VSU on November 9, 2007 and February 24, 2009, (see Pl.'s Opp'n, Ex. T and Defs.' Reply, Mveng-Whitted Dep. Ex. 15), but these are too far removed from the date of the terminal contract (May 3, 2010 – more than fourteen (14) months later) to establish causation. Ordinarily there must be "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. A "lengthy time lapse between the [defendants'] becoming aware of the protected activity and the alleged adverse . . . action" often "negates any inference that a causal connection exists between the two." *Id.* (citation omitted); *see also Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation."). This is particularly true where Mveng-Whitted must show that VSU issued the terminal contract *because* she engaged in protected activity. *See Nassar*, 133 S. Ct. at 2528, 2534.

Even if Mveng-Whitted could establish a prima facie retaliation claim with respect to the issuance of the terminal contract, she cannot show that VSU's reason for the terminal contract was pretext for the reasons set forth in Part IV.A.2.a, *supra*. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006) (en banc) (expressly noting that retaliation claims are tested under the *McDonnell Douglas* burden-shifting framework).

---

[11] Including all of Mveng-Whitted's "external complaints," to include her filings with Virginia's Human Rights Council (August 2010), Virginia's Department of Human Resource Management (August 2010), and the EEOC (October 2010). Mveng-Whitted received the terminal contract letter before any of these filings, in May 2010.

22

3.    *Foundation Courses*

a.    *Discrimination.*

Mveng-Whitted's claim about her course assignments similarly lacks merit. Mveng-Whitted alleges that course assignments, particularly foundational courses outside of her precise area of expertise, adversely affected her employment because they make her appear incompetent. In the fall of 2009, Larose determined that all faculty should teach at least one foundation class. Larose assigned Mveng-Whitted to teach certain foundation courses in studio art, instead of those in Mveng-Whitted's disciplines of graphic design and African art. (Pl.'s Statement of Material Disputed Facts ¶¶ 10-15.) Larose also required Caucasian instructors to teach foundation courses. (Mveng-Whitted Dep. 60:6-19.) Larose himself taught a foundation course. (*Id.* 60:20-24.) Mveng-Whitted acknowledges that she taught foundation courses both before and after Larose's chairmanship. (*Id.* 63:3-5.) But she contends that the foundational course assignments harmed her career because they made her appear incompetent since the courses were beyond her areas of expertise, and because she did not have enough time to prepare to teach them.

The universal application of the policy across the department negates the effect on Mveng-Whitted, making it unreasonable, as a matter of law, to consider the assignments materially adverse employment actions. Mveng-Whitted suffered no decrease in pay or decrease in benefits in being asked to teach foundation courses. Simply receiving a difficult or unpleasant assignment does not amount to an adverse employment action. *See Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 639 (2d Cir. 2000) (plaintiff did not suffer adverse employment action where "he was denied assignment to the P.S. 4 computer lab, not assigned for the start of the 1993-94 school year, mis-assigned to [another school], and then ultimately assigned to [a

23

school] where he was forced to teach outside his area of expertise"); *Klein v. New York University*, 786 F. Supp. 2d 830, 847 (S.D.N.Y. 2011) ("A university professor's dissatisfaction with course assignments when he or she does not allege any resulting loss in wages is not an adverse employment action.") (internal quotation marks and citation omitted); *see id.* ("Klein has not offered any evidence that the aspect of her teaching schedule of which she complains impacted her compensation or other material benefits. Thus, her course assignments and the composition of her classes cannot be considered adverse employment actions.").

Even if Mveng-Whitted's discontent with her teaching schedule did constitute an adverse employment action, the evidence of her assignments simply does not give rise to an inference of discrimination. To the contrary, the evidence shows that VSU treated her no differently than other faculty.

*b.     Retaliation*

Any retaliation claim premised on Mveng-Whitted's assignment of foundation courses fails as a matter of law because Mveng-Whitted cannot show that but for any complaint against the University she may have asserted, she would not have been tasked with teaching such classes. Accordingly, the Court GRANTS the defendants' motion for summary judgment with respect to Counts 3 and 4.

### B. The Section 1981 Claim Against Larose

In her lone remaining individual claim against Larose, Mveng-Whitted claims that Larose discriminated against her on the basis of race in violation of 42 U.S.C. § 1981. (Dkt. no. 26.) More specifically, Hawthorne's complaint against Larose "has to do with discriminatory actions taken by Mr. Larose after the formation in plaintiff's employment contracts which interfered with the contractual rights and enjoyments and benefits thereof." (Dkt. no. 27 at 2.)

"Section 1981 outlaws race discrimination in the making and enforcement of private contracts." *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 256 (4th Cir. 2001). The statute provides, in pertinent part, that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b). As this Court previously held, a four-year limitations period applies to Mveng-Whitted's § 1981 claim. *See Mveng-Whitted-Whitted v. Va. State Univ.*, 2013 U.S. Dist. LEXIS 24028, at *10-11 (E.D. Va. Feb. 21, 2013). Accordingly, Mveng-Whitted may support her § 1981 claim by relying on any allegedly discriminatory conduct occurring between December 17, 2007, and December 17, 2011.

When analyzing § 1981 claims, the Court employs the familiar proof standards under Title VII of the Civil Rights Act. *See Gairola v. Virginia Dept. of Gen. Serv.*, 753 F.2d 1281, 1285 (4th Cir. 1985) ("Under Title VII and either § 1981 or § 1983, the elements of the required *prima facie* case are the same.").[12] Because the Court granted the defendants judgment as a matter of law with respect to the denial of Mveng-Whitted's application for full professor, the issuance of a terminal contract, and assigning her to teach foundation courses, defendants are entitled to judgment as a matter of law concerning these same issues under § 1981.

That leaves the allegation that Larose, individually, eliminated all of Mveng-Whitted's teaching responsibilities in the art and design department because of her race.

---

[12] One important difference between § 1981 and Title VII is that the latter authorizes suit only against the employer as an entity, rather than against individuals acting as agents of the employer. Under § 1981, individuals can be found liable.

To establish a § 1981 claim, Mveng-Whitted must show: (1) that she is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) the discrimination concerns one or more of the activities enumerated in the statute. *See Jordan v. Alt. Resources Corp.*, 458 F.3d 332, 345 (4th Cir. 2006), *cert. denied*, 549 U.S. 1362 (2007).

Where, as here, the record contains no direct evidence of discrimination, Mveng-Whitted may avert summary judgment by "proceed[ing] under a 'pretext' framework, under which the employee, after establishing a *prima facie* case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Holland*, 487 F.3d at 213 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)) (internal quotation marks omitted).

To establish a *prima facie* case of race discrimination without the direct evidence of discriminatory intent, a § 1981 plaintiff must show that (1) she is part of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she was subjected to an adverse employment action; and (4) the circumstances of the adverse action "rationally support the inference that the adverse employment action was motivated by unlawful considerations." *Byrge v. Va. State Univ. Bd. of Visitors*, 2013 U.S. Dist. LEXIS 81322, at *12-13 (E.D. Va. June 10, 2013).

*1.    Cessation of Teaching Responsibilities in the Art Department.*

Mveng-Whitted argues that she suffered an adverse action because she no longer teaches courses in the art and design department.  In December 2010, Mveng-Whitted requested that her office be relocated because of the "hostile environment" she faced from Larose in the art and design department.  Significantly, Mveng-Whitted *did not ask* that she be relieved of teaching assignments pertaining to her areas of expertise – African art and graphic design.  (Mveng-

26

Whitted Aff. ¶ 35.)  Nonetheless, by the fall of 2011, Mveng-Whitted had been relieved of all teaching assignments in the art and design department where she had taught for the previous thirteen years. (*Id.* ¶¶ 35-36.) Larose also removed Mveng-Whitted "from participation on any committees within the department." (*Id.* ¶ 47.)  According to Mveng-Whitted, her contract requires her to serve on departmental committees, and she has received negative reviews due to her lack of participation on such committees. (*Id.* ¶ 53.)

Plaintiff's § 1981 claim must fail because no reasonable juror could conclude that Mveng-Whitted suffered an adverse employment action when VSU changed her teaching assignments.  Mveng-Whitted remains a tenured professor, with no reduction in salary or benefits. She is fully utilized by the mass communications department, where she is scheduled to handle a full course load this fall.  In this capacity, she has worked on graphic design projects and taught graphic design courses, areas in her field of expertise.  (Mveng-Whitted Aff. ¶ 41.) She enjoys her assigned work and she earns a higher salary now than at the time she requested her office be relocated.  She may engage in scholarly work as a professor, and her job duties are no more demanding now than they were previously.

Typically, adverse employment actions are events such as dismissal, suspension, failure to promote, or pay cuts. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761-62 (1998) ("A tangible employment action in most cases inflicts direct economic harm."). And "[w]hile adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996).  "The mere fact that a new job assignment is less appealing to the employee . . . does not constitute adverse employment action." *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 219 (4th Cir. 2007). "Absent any decrease in compensation, job title, level of

responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Id.* (citations omitted).[13]

"[R]eassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect on her." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999). Mveng-Whitted's "dislike of [her] new position, alone, does not transform the transfer into an adverse employment action." *Cole v. Hill Phoenix, Inc.*, 2013 U.S. Dist. LEXIS 16877, at *12 (E.D. Va. Feb. 7, 2013); *see also Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 729 (7th Cir. 2009) (transfer of twelfth grade English teacher to seventh grade did not constitute adverse employment action where teacher suffered no cut in pay, benefits or privileges of employment); *Rivera v. Prince William County Sch. Bd.*, 2009 U.S. Dist. LEXIS 63647, at *20-21 (E.D. Va. July 22, 2009) (no adverse action where a fifth grade teacher was transferred to teach third grade at another school in the district, even though the teacher opposed the transfer); *Huber v. Texas Woman's Univ.*, 504 F. Supp. 2d 198, 203 (S.D. Tex. 2007) (male professor at female university did not suffer adverse employment action when he was assigned to teach platform courses because such a decision "is not an ultimate employment decision protected by Title VII's anti-discrimination provisions.").

Finally, Mveng-Whitted argues that requiring her to teach courses for which she has little experience or training could negatively affect her annual performance evaluation, or perhaps

---

[13] It is important to note that *Burlington Northern*'s standard used to define adverse employment actions in the retaliation context does not apply to Title VII's substantive antidiscrimination provision. *See Brockman v. Snow*, 217 F. App'x 201, 205-06 & n.3 (4th Cir. 2007). With respect to the latter, the Fourth Circuit continues to require that a plaintiff show an "'ultimate employment' action that affects 'hiring, granting leave, discharging, promoting, and compensating.'" *Id.* at 205 (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)).

even reduce her chances of being promoted to full professor at some point in the future.  This is similar to the complaint in *Jones*, where the employee contended that a reassignment – which did not result in a decrease in salary, benefits, or bonus – "stymied" his "potential for promotion and professional development."  368 F.3d at 376.  In holding the employee did not suffer an adverse action, the Fourth Circuit said that "speculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute." *Jones*, 368 F.3d at 377.  And so it is here.[14]  Because Mveng-Whitted did not suffer a "significant detrimental effect" concerning the terms, conditions or benefits of her employment, *Boone*, 178 F.3d at 256, she also did not suffer an adverse employment action.  Accordingly, Mveng-Whitted cannot make out a *prima facie* case under Section 1981, and the defendants are entitled to judgment as a matter of law.

Moreover, for reasons discussed above that the Court will not repeat here, the Court finds no evidence on which a rational jury could infer that racial animus motivated anything that happened to her.  This alone requires dismissal.

### V.   CONCLUSION

For the reasons set forth above, the Court GRANTS summary judgment to the defendants.  Accordingly, the Court DISMISSES the case.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Memorandum Opinion to all parties of record.

Date: September 12, 2013
Richmond, VA

/s/
John A. Gibney, Jr.
United States District Judge

---

[14] In fact, considering that Mveng-Whitted's promotion application had already failed in the art and design department, the transfer did not reduce her chances for promotion.